# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ALABAMA

In re

TERRY LEE BENTLEY,                                          Case No. 04-15825-MAM-13

     Debtor.

TERRY LEE BENTLEY,

     Plaintiff,

vs                                                          Adv. No. 06-01002-MAM

NISSAN MOTOR ACCEPTANCE CORP.,

     Defendant.


**ORDER AWARDING PLAINTIFF ACTUAL AND PUNITIVE DAMAGES
FOR WILLFUL VIOLATION OF AUTOMATIC STAY, DISMISSING
PLAINTIFF'S § 329 CLAIM, GRANTING NISSAN'S MOTION FOR
RELIEF FROM STAY, AND ALLOWING NISSAN'S CLAIM AS AMENDED.**

Roy Kadel, attorney for debtor, Mobile, Alabama
Franklin V. Anderson, special counsel for plaintiff, Mobile, Alabama
Eric J. Breithaupt, attorney for Nissan Motor Acceptance Corp., Birmingham, Alabama

This matter came before the court on the plaintiff's complaint alleging a willful violation

of the automatic stay and interference with the attorney client relationship, as well as Nissan's

motion for relief from stay and the objection filed by the debtor to Nissan's claims. The court

has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334 and by the Order of

Reference of the District Court. These matters are core proceedings under § 157(b)(2) and the

court has authority to issue a final order. For the reasons indicated below, the court finds the

defendant willfully violated the automatic stay, but is dismissing the plaintiff's interference with

-1-

attorney client relationship claim.  Additionally, the court is granting Nissan's motion for relief from the automatic stay and is allowing Nissan's claim as amended.

BACKGROUND

This trial dealt with several different issues in both the adversary case and the debtor's bankruptcy case.  The primary issues in the adversary involve the repossession of plaintiff's truck after he had filed for bankruptcy and the amount of damages plaintiff should be awarded due to the repossession.  Nissan, the defendant in the adversary case, has stipulated that the repossession was a violation of the automatic stay.  Nissan acknowledges that it received notice of Bentley's bankruptcy before the repossession occurred, but that it did not take appropriate measures to stop the repossession.  Nissan accepts responsibility for the wrongful repossession.  However, after Bentley's vehicle was repossessed, by a sub-subcontracted repossession agent, the police were contacted to investigate a white powdery substance, suspected to be cocaine, that was allegedly found in the console of Bentley's truck by the repossession agent.  As a result, the responding officer recovered the suspected drugs and filed an incident report.  Bentley and his attorneys have strenuously denied that any drugs were in the truck when it was repossessed and have accused the repossession agent of planting the drugs in the vehicle.  As a result of the wrongful repossession and the "planted" drugs and "false" police report, Bentley and his counsel elected to sue Nissan for actual and punitive damages.  Nissan denies any liability for the alleged actions of the repossession agent after the vehicle was repossessed, as it was a separate act from the repossession and if done, was outside the scope of Nissan's authorization of repossession.

The adversary also contained a claim by Bentley against Nissan for malicious interference with the attorney-client relationship and the contract of employment approved by this court under

its rules and 11 U.S.C. § 329. In addition, the trial also encompassed several issues in Bentley's bankruptcy case. These issues involve the claims filed by Nissan in Bentley's bankruptcy case, including replacement and amended claims, and Bentley's objections to the claims, as well as a motion for relief from stay filed by Nissan. The court will discuss each issue in turn.

*THE WRONGFUL REPOSSESSION*

FACTS

On October 12, 2001, the plaintiff, Terry Lee Bentley, entered into a simple interest retail installment contract with the defendant, Nissan Motor Acceptance Corporation, to purchase a 1999 Ford F-150 truck. Under the terms of the contract, Bentley agreed to make payments to Nissan in the amount of $459.58 per month for a period of 60 months. Bentley made twelve separate payments to Nissan under the contract, the last of which was received on or about May 8, 2003. Bentley subsequently defaulted under the contract by failing to make any additional payments. On November 4, 2003, Bentley filed a Chapter 13 bankruptcy case in this court, listing Nissan as a secured creditor and proposing to make monthly payments to Nissan through his plan. This bankruptcy case was dismissed on May 13, 2004 due to lack of payments.[1]

On May 26, 2004, with the bankruptcy dismissed and the automatic stay terminated, Nissan directed its repossession contractor, Remarketing Solutions, to repossess Bentley's truck.[2] The repossession order continued unsuccessfully until Nissan withdrew the order on or about

---

[1] From the time of his bankruptcy filing until his case was dismissed, Bentley only paid $264.00 into his case. Because of the lack of payments, Nissan (nor any other creditor except for Bentley's bankruptcy attorney) did not receive any payments from Bentley's bankruptcy plan.

[2] According to Carolyn Brown, Nissan's designated corporate representative, when Remarketing gets the repossession order, it subcontracts the order to other repossession agents. Then that subcontracted party may sub-subcontract the order to another party.

-3-

June 29, 2004.  Nissan then issued an order to GC Services to do a more in depth locator search.

On August 4, 2004, Nissan had installed a new software program on its system, which was

intended to account for the use of GC Services locator services in repossession orders.  Once GC

Services located Bentley's vehicle it contacted Remarketing with the information needed to bring

about the repossession.  Remarketing then subcontracted the repossession order to Ascension

Recovery.[3]

Before the truck was repossessed, Bentley filed another Chapter 13 bankruptcy on

October 6, 2004.  On October 13, 2004, Nissan received notice of Bentley's bankruptcy filing

through its bankruptcy notice subscription with LexisNexis.  However, because of an error in a

computer software program that had been recently installed, Nissan's computer program did not

recognize Bentley's account as having gone into bankruptcy and thus the cue to withdraw the

repossession order on Bentley's vehicle did not occur.[4]

On the evening of October 21, 2004, Bentley drove his truck to the Tarpon Lounge.

Around 8:30 p.m., another Tarpon Lounge patron, Sanford Boltz, walked outside and noticed

two men in a tow truck had backed up to Bentley's truck, hooked Bentley's truck to the wrecker,

and were preparing to tow the vehicle.  Boltz ran back inside the Lounge to notify Bentley of the

situation.  Then, as Bentley and other Lounge patrons came outside to assess the situation, Boltz

---

[3] It appears that Ascension sub-subcontracted the repossession order to another recovery
company, but it is unclear if that company actually repossessed the vehicle or if it subcontracted
the recovery to another entity.  Regardless of how the contract was assigned to it, it appears that
the repossession order was fulfilled by Gulf Coast Recovery, and one of its repossession agents,
Aaron Dwight Ball.

[4] NMAC's corporate representative, Carolyn Brown, testified that the computer
programming error was corrected as soon as it was discovered, so that Bentley was the only one
of NMAC's files that the was affected by the error.

-4-

parked his own vehicle in front of the tow truck, blocking it, so that Bentley's truck could not be towed.

Valerie Russo, the bartender at the Tarpon Lounge that night, went outside as well, and asked the two men what they were doing. The men replied they were repossessing Bentley's vehicle. Russo told the men they were on private property and asked them to leave. Russo testified that one of the men replied that they were repossession agents and did not have to leave because they were above the law. Bentley introduced himself to one of the repossession agents and informed him he was the owner of the truck. According to Bentley, the man replied his name was "Ball" and that he worked for Gulf Coast Recovery. Bentley informed Ball that he had filed for bankruptcy and that his truck should not be towed. Bentley told Ball that he could get his bankruptcy papers from home to prove that he had filed bankruptcy. According to Bentley, Ball replied that he did not care what Bentley had, he was going to repossess the truck. Both Bentley and Russo testified that the repossession agent said this numerous times during the ordeal.

Bentley called his mother at home, asking that she bring his bankruptcy papers to the Lounge so that he could show them to the repossession agent. Meanwhile, Boltz took one of the repossession agents off to the side to talk to him. According to Boltz, he told the repossession agent that he was not going to move his truck to allow the tow truck to leave unless the repossession agents removed Bentley's truck from the wrecker or the police ordered Boltz to move his truck. Boltz said he told the repossession agent that Bentley had his bankruptcy papers on the way and that it would be best to wait until the papers arrived or to call the police.

Bentley's mother, Doris Loper, and his sister, Sharon Pratt, arrived at the Lounge with

Bentley's bankruptcy papers about 20 minutes after Bentley called them. While Loper remained in the car, Pratt got out and delivered the papers to Bentley, who then showed them to Ball. After Bentley showed the repossession agents his bankruptcy papers, the repossession agents wrote down Bentley's case number and signed something. Then the repossession agents lowered Bentley's truck from the wrecker and Boltz moved his truck so that the repossession agents could leave. Russo testified that the repossession agents stayed outside the Lounge for about 30-45 minutes after Bentley showed them the bankruptcy papers, bickering with Bentley and others, before the repossession agents left. As the repossession agents were leaving the Lounge, Bentley testified that one of the repossession agents yelled, using expletives, that he would repossess Bentley's truck sooner or later.

Boltz testified that while he was off to the side talking to the repossession agent, he did not know what the other repossession agent was doing, but said that throughout the ordeal he did not recall any foul language being used by either of the repossession agents. From start to finish, the witnesses estimated the repossession agents remained outside the Lounge between one and two hours. None of the witnesses recalled seeing any markings or signage on the tow truck and no one testified that they got a business card or any identification from the repossession agents. At trial, the witnesses were shown photos of two separate men. The witnesses identified one of these photos as being one of the repossession agents present at the Lounge. Bentley identified this man as "Ball." Bentley identified the picture of the other man, whom no one else identified, as the second repossession agent.

Following the incident at the Tarpon Lounge on October 21, 2004, Bentley testified he called Nissan at its billing number and informed someone at Nissan of his bankruptcy. However,

-6-

Bentley could not recall what date he called Nissan, or who he talked with at Nissan. Nissan's file on Bentley contains no mention of a call from Bentley, nor does the file contain any mention of the Tarpon Lounge or an attempted repossession of Bentley's truck on October 21, 2004.

On Sunday October 24, 2004, Bentley arrived at home around 1:00 a.m. and parked his truck in the front yard of the home he shared with his mother. A few hours later, about 5:00 a.m. Sunday morning, Bentley's mother awoke and noticed Bentley's truck was not outside. She awakened Bentley and told him his truck was not in the yard. Bentley went outside and could see tire tracks in the yard where the truck had been towed. Bentley called the Mobile County Sheriff's office to report his truck stolen, but the Sheriff's office told him the truck had not been stolen, but had been repossessed by Ball of Gulf Coast Recovery. The Sheriff's office then gave Bentley a phone number for Ball. Bentley attempted to call Ball at the number provided by the Sheriff's office, but could not get any answer. Bentley attempted to call his bankruptcy attorney, Roy Kadel, but as it was Sunday, he could not reach Kadel at the office. The next day, Monday October 25, 2004, Bentley contacted Kadel and informed him of the situation.

As mentioned above, although Nissan had received notice of Bentley's bankruptcy on October 13, 2004, because of a programming error in its newly installed computer software, Bentley's file was not properly recognized as a bankruptcy case and thus the outstanding repossession order had not terminated. Additionally, it appears from the evidence that Aaron Dwight Ball, the repossession agent who reportedly attempted to repossess Bentley's car from the Tarpon Lounge, did not notify Nissan that Bentley had filed bankruptcy nor did Ball seek verification regarding Bentley's bankruptcy case once Ball was provided the bankruptcy information by Bentley. According to the testimony of Carolyn Brown, Nissan's corporate

-7-

representative at trial, Nissan instructs all repossession agents that once they are informed of a bankruptcy filing, they are to desist from taking any repossession action and are instructed to seek verification of bankruptcy by contacting Nissan, Remarketing, or Remarketing's chosen subcontractor.

Despite having been notified of Bentley's bankruptcy at the Tarpon Lounge just a few nights before, Ball repossessed Bentley's truck in the early morning hours of October 24, 2004. The repossession took place without any resistance, as no one at Bentley's residence even knew the repossession had occurred until sometime after the vehicle was gone. Bentley's truck was towed to a location on Louis Tillman Road in Grand Bay, Alabama, where Ball prepared a written inventory of items in Bentley's truck, and also filled out a vehicle condition report, which noted several areas of damage to the vehicle. Sometime during the morning of October 24, 2004, Ball contacted the Mobile County Sheriff's Office to report that he had found a plastic bag containing a white powdery substance, suspected to be cocaine, in the repossessed vehicle. At 9:24 a.m. Deputy Patrick Bolton was dispatched to the Louis Tillman Road address to investigate the suspected drugs. Bolton testified that upon arriving at the address Ball showed him the white powdery substance that he had allegedly found in center console of Bentley's vehicle. Ball told Bolton that Bentley's driver's license was found in the console as well.

Deputy Bolton testified that he stayed at the address approximately 20 minutes talking to Ball and that he did not observe anything that made him think Ball had planted the drugs. Deputy Bolton recovered the suspected drugs and, as noted in the incident report, he turned the drugs in to the Sheriff's Office property department to be destroyed because of lack of probable

cause to make a successful case.[5]  Bolton closed the case on Bentley that same day, which is also noted in the incident report, because of chain of custody problems.

According to Kadel's testimony, on the morning of October 25, 2004, Bentley called him and told him his truck had been repossessed.  According to Kadel, he was provided information that Bentley's truck had been repossessed by Ascension Recovery & Towing.[6]  Kadel located a company by that name in Trussville, Alabama and placed a call to them at approximately 8:30 a.m. on Monday, October 25, 2004.  Kadel informed an Ascension employee that Bentley had filed bankruptcy, provided Bentley's bankruptcy case number and left a message to have one of Ascension's two owners call him back promptly.  Around 3:20 p.m. Kadel called Nissan's attorney, Eric Breithaupt, and left a detailed message on Breithaupt's voice mail.  Around 3:45 p.m., Paula from Ascension called Kadel, telling him that Ascension had forwarded his message to Nissan.  Paula also informed Kadel that drugs had been found in Bentley's truck.[7]  This was the first time Kadel heard about the drugs.  After the call from Paula, Kadel called Bentley, asking him about any drugs in the truck.  Bentley denied that any drugs were in the vehicle and denied that he used drugs.  Kadel told Bentley to make a list of everything that was in the truck at the time of the repossession.

---

[5] Deputy Bolton testified that it would be difficult to establish who owned the drugs.  He stated the drugs could have belonged to the debtor, someone else who rode in the truck or could have been placed there by anyone else.

[6] It was unclear from Kadel's testimony or his notes, which were received into evidence, who informed Kadel the truck had been repossessed by Ascension.  Bentley testified he was told by the Mobile County Sheriff's Office that the truck was repossessed by Gulf Coast Recovery.

[7] After contacting the police, Ball apparently notified Ascension that drugs had been found in Bentley's vehicle, that the police were called, and that the police confiscated the drugs.  Nissan's file notes that Ascension relayed this information to Nissan.

The afternoon of October 25th, Kadel received a call from Sherry Lampkin, a senior bankruptcy specialist at Nissan. Lampkin told Kadel that Nissan had ordered the repossession and did not realize Bentley had filed another bankruptcy until after the repossession had occurred. Lampkin also told Kadel that Nissan had been informed that drugs were found in the vehicle, and that the local police had been notified. Kadel told Lampkin that if there were any drugs in the vehicle they had been planted by the repossession agent. Kadel also stated that if the truck was not returned by 8:00 a.m. the next morning, he would file suit. When Kadel asked Lampkin where the police report was filed and how much and what kind of drugs were found, Lampkin directed Kadel to contact Nissan's attorney, Breithaupt.

The next morning, Lampkin told Kadel that Nissan wanted to return Bentley's vehicle but needed to know the proper address for delivery. According to Lampkin's testimony, which was supported by Nissan's file notes, Kadel would not provide Nissan with a delivery address and repeatedly stated that he wanted to be paid for his time talking to Nissan. Lampkin testified that Kadel seemed more concerned with getting paid than with getting Bentley's truck returned. Lampkin also informed Kadel that the drugs found in Bentley's car had been recovered by the police. Kadel then asked Lampkin for a copy of the police report. Lampkin told Kadel that he needed to talk to Nissan's attorney about the police report, as she was only concerned with getting Bentley's vehicle returned and needed an address to bring about the return.

Later that day, Bentley brought Kadel a handwritten list of property that was in his vehicle at the time it was repossessed. Due to the fear of criminal prosecution for the drugs, Kadel suggested that Bentley take a drug test. Bentley took a drug test that day, October 26, 2004, and tested negative for all drugs.

-10-

That afternoon, Breithaupt faxed Kadel a letter informing Kadel that Nissan would deliver the car to wherever Kadel designated and asked Kadel to notify his law firm right away so that the truck could be returned expeditiously. Around 2:45 p.m., Brad Hightower, another of Nissan's attorneys, called Kadel. Hightower told Kadel he did not know where Bentley's truck was being held, but said Nissan wanted to return it and needed to know where to return the vehicle. Kadel gave Hightower the address of the home Bentley and his mother were living in as the proper delivery address. After providing the address, Kadel's notes indicate he contacted attorney Franklin V. Anderson and Robert St. John, a private investigator, to begin working on protecting Bentley from "unfounded criminal allegations."

On the evening of October 26, 2004, around dusk, Bentley's truck was returned to his residence by three people. Bentley's mother and sister were at the residence when the vehicle was returned and his sister testified that she recognized one of the men who returned the truck as one of the repossession agents at the Tarpon Lounge on October 21, 2004. Bentley was not home at the time of the delivery because Kadel and/or St. John had advised him to not be around the truck until it could be searched by St. John, for fear that the truck could have other drugs "planted" inside. Bentley did not return home for approximately one week to give St. John time to thoroughly search the vehicle.

St. John testified he was told by Kadel to search, photograph and inventory the truck for any drugs. St. John searched Bentley's truck for about two hours, but did not find any drugs. Kadel then instructed St. John to locate the towing company that repossessed the truck and interview the person or people that repossessed the vehicle as well as those who returned it. However, St. John was unable to locate the company or the repossession agents with the

-11-

information he was given. Likewise, St. John was not able to locate a copy of the Sheriff's Office incident report.[8]

On October 29, 2004, after Bentley's vehicle had been searched by St. John, Bentley returned home and reclaimed possession of the truck. Bentley, in a handwritten affidavit dated November 2, 2004, notarized and signed under oath, stated that when he got the truck back it had suffered damage to the rear bumper, right rear corner panel, and tailgate. In addition, the affidavit stated that several items were missing from the truck. The items listed in Bentley affidavit as missing were: $275.00 cash, a new pair of New Balance shoes, 10 CDs, a NADA book, and a bracelet. Bentley also testified at trial some of the other items he listed as being in the truck on the day it was repossessed were also missing and have not been returned to him. These additional missing items were his wallet (which had his driver's license, social security card and pictures of his children inside), a Craftsman tool set, an ice chest containing a case of bottled water and diet root beer, and a safter hammer. In total, Bentley believed the items missing from his truck were worth about $450.00. Additionally, Bentley testified that since his truck was returned it has had transmission and brake problems, as well as the body damage. Bentley stated that he had never experienced these problems before the repossession.

In contrast to Bentley's testimony regarding the alleged damage to his truck that occurred between the time the vehicle was repossessed and the time it was returned, Bentley's mother testified that she did not notice any new damage to the truck when it was returned. St. John, the

---

[8] It should be noted that St. John never talked to Bentley. Bentley testified to this fact. Bentley knew from the morning of the repo that Ball was the repo agent, Bentley had received Ball's phone number from the Mobile County Sheriff's Office, and he knew that the Mobile County Sheriff's Office was involved. If St. John had ever talked to Bentley it seems that the towing company, the repo men, and the incident report could have been easily located.

-12-

private investigator, testified during his inspection of the truck he noticed damage to the passenger side of the truck, but when he asked Bentley's mother about this damage she told him the damage was there before the repossession. Bentley had also testified that the truck suffered damage during the area's previous hurricanes and that, despite knowing Nissan had a lien on the vehicle, he did not have the damage repaired. In addition, the property condition report completed by the repossession agent on the day of the repossession, and received into evidence without objection, stated that "every part of [the] truck [is] dented and scratched except [the] front bumper." The report also states that all mirrors on the truck were missing, the passenger side window was broken, the cloth seats were torn, the headliner and carpet were stained, a visor was missing, the door buttons were broken and there were burn holes in the interior.

Besides the physical damage to the truck and the items missing, Bentley's attorney argues that Bentley has experienced emotional distress as a result of the allegedly false drug accusations. Bentley's trial attorney argued that Bentley has lived in a state of terror since he learned that there was a police report filed reporting drugs found in his vehicle. To this end, Bentley testified that since he learned of the police report, he has felt scared, embarrassed, terrified, nervous, and disappointed because he has never used drugs and he has been falsely accused of having drugs in his vehicle. Bentley testified that he is not taking any medication now, but that he has taken depression medication since the incident occurred. Bentley said he is scared to let his children ride in his vehicle for fear he will be pulled over and possibly arrested as a result of the police report. Bentley also testified that seeing the police report, which states that the case was closed and the evidence had been destroyed, and hearing the Deputy Bolton testify that the case was closed due to lack of sufficient evidence did not ease his fear of prosecution and that he still

-13-

worried that he will be arrested because of the police report.

Contrary to Bentley's testimony, his mother, who sees Bentley nearly every day and with whom Bentley lives, testified that since the repossession Bentley has not acted any differently than before. Also, it should be noted that in the 20 months from the time of the police report to the time of trial, Bentley testified he has not been contacted by any law enforcement officer regarding the drugs found in the vehicle. Additionally, Bentley's testimony that he had seen a doctor eight or nine months ago and had taken depression medication was contrary to his previous deposition testimony, in which he testified he had not seen any doctors or taken any medication.

Bentley's counsel argued Bentley suffered continued emotional distress and should be awarded substantial damages because Nissan repeatedly refused to provide them with a copy of the police report or inform them where the report was filed for approximately 15 months. Bentley's counsel provided little evidence to support this argument. Kadel, who testified during the trial, did not provide any testimony to support this assertion. Kadel's notes, which were stipulated to be his testimony, only show he asked about the report twice. Once he asked Lampkin which police department the report was made. Lampkin replied that Kadel should talk to Breithaupt to get that information. On the other occasion Kadel asked Hightower where the police report was made. Hightower responded that he did not know where the report was made. Nissan's file notes indicate Kadel told Lampkin two times during the course of a conversation on October 26, 2004, that he wanted a copy of the police report. Both times, Lampkin told Kadel he needed to talk to Nissan's attorneys about that.

Bentley and his counsel did not obtain a copy of the police report until February 9, 2006.

They allege that they could not locate the report on their own and Nissan and its attorneys refused

multiple requests to provide them with a copy of the report. Bentley argues this refusal by

Nissan led to additional emotional distress by Bentley because they did not know what the report

stated regarding the amount of drugs found or if Bentley would be charged with a crime. Nissan

disputes this allegation.

Lampkin testified that she did not see a copy of the police report until February 9, 2006.

She stated that she did not know where the report was made, that she had informed Breithaupt

that there was a police report but she did not tell him where it was filed, and that she did not talk

to Hightower about the case until February 9, 2006. Breithaupt testified that he was never asked

by Kadel or anyone else to provide a copy of the police report or its location. Breithaupt further

testified that he provided the report to Bentley's counsel on February 9, 2006, under the

discovery order for this case.

LAW

 Section 362(h) of the Bankruptcy Code governs violations of the automatic stay. That

section states that:

> An individual injured by any willful violation of a stay provided by this section
> shall recover actual damages, including costs and attorneys' fees, and, in
> appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h). A stay violation is "willful" if the creditor knew there was an automatic stay

and took action anyway. *Han v. GE Capital Small Business Finance Corporation (In re Han)*,

333 B.R. 881, 887 (Bankr. N.D. Fla. 2005); *See, Jove Engineering, Inc.*, 92 F.3d 1539, 1555

(11th Cir. 1996) (If the creditor knew that the automatic stay had been invoked and intended the

action that violated the stay, the stay violation is willful.); *Rutherford v. Auto Cash, Inc. (In re*

-15-

*Rutherford)*, 329 B.R. 886, 898 (Bankr. N.D. Ga. 2005). Bentley has the burden of proving that

he was harmed by the stay violation by a preponderance of the evidence. *Han*, 333 B.R. at 888

(citing *Smith v. GTE North Inc. (In re Smith)*, 170 B.R. 111, 115 (Bankr. N.D. Ohio 1994).

In this case, Nissan attributes its failure to halt the repossession order after it got notice of

Bentley's bankruptcy to a programming error in a newly installed computer program. Nissan's

corporate representative testified that the programming error has been corrected and that no other

wrongful repossessions occurred due to this error. Nonetheless, Nissan admits it willfully

violated the automatic stay because it had actual notice of Bentley's bankruptcy by at least

October 13, 2004, and it intended to and did have Bentley's vehicle repossessed on October 24,

2004. Likewise, although Nissan's representatives testified that they did not learn of the October

21, 2004 incident at the Tarpon Lounge until February 9, 2006, Nissan concedes that it is

responsible for the attempted repossession that night. Therefore the only disputed issues

regarding the wrongful repossession claim relate to damages.

Section 362(h), as noted above states that "[a]n individual injured by any willful violation

of a stay provided by this section shall recover actual damages, including costs and attorneys'

fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C.§ 362(h).

Without dispute, Bentley is entitled to his actual damages, including his costs and attorneys' fees.

Actual damages are "compensatory damages." *Han*, 333 B.R. at 888. They are "real, substantial

and just damages, or the amount awarded to a complainant in compensation for his actual and

real loss or injury, as opposed to 'nominal' damages and 'punitive' damages." *McMillian v.

F.D.I.C.*, 81 F.3d 1041, 1055 (11th Cir. 1996) (quoting Black's Law Dictionary (6th Ed. 1991);

*Cox v. Billy Pounds Motors, Inc. (In re Cox)*, 214 B.R. 635, 642 (Bankr. N.D. Ala. 1997). The

evidence presented showed that Bentley incurred $450.00 in actual damages as a result of items missing from his truck. Additionally, Bentley testified that his truck suffered body and mechanical damage as a result of the repossession. However, there was no evidence presented as to the dollar amount of this damage. Nissan suggested and the court agrees that the amount of damage to the truck is probably represented by Bentley's reduction in the value of the truck in his amended Chapter 13 plan filed in his bankruptcy case just a few days after the truck was returned. The truck had originally been valued by Bentley at $8,563.00, but the plan was amended on November 2, 2004, six days after the truck was returned, reducing the value of the truck to $5,300.00. The court believes this $3,263.00 reduction less than a month after the bankruptcy filing represents what Bentley alleges was the damage to his truck as a result of the repossession.

The evidence as to what actual damage was done to Bentley's truck as a result of the repossession is in dispute. Bentley testified to substantially more damage than Bentley's mother or the private investigator did. However, based on the preponderance of the evidence standard, the court concludes that Bentley should be awarded the $3,263.00 value reduction amount as actual damages as well. Bentley knows his truck and its condition better than his mother or the private investigator and Bentley was a credible witness on this point.

Bentley also seeks an award for the fees incurred by his bankruptcy attorney, special counsel, and private investigator. The court has previously approved Bentley's employment of Anderson, as special counsel to represent Bentley in this case and St. John, the private investigator, but these fees are Bentley's responsibility unless the court orders otherwise. St. John provided an invoice detailing 21 hours of work at $50.00 per hour, plus mileage and

-17-

documentation fees for a total bill amount of $1,484.20. St. John testified that he actually worked more on this case than shown on the invoice, but that he is only charging the invoiced amount.

St. John was hired by Bentley, on the advise of Kadel and Anderson, to investigate the police report filed against Bentley and to locate and investigate the repo agents responsible for the repossession of Bentley's truck. Despite the time spent, St. John did not find the police report nor was he able to locate the repo agents. Nissan does not believe it should be responsible for this bill as it did not require any of this work as a prerequisite to returning Bentley's vehicle to him. Nonetheless, the court finds that St. John's invoice is part of the damages Bentley suffered as a result of Nissan's willful violation of the automatic stay and Bentley will be awarded the invoice amount of $1,484.20 as part of his actual damages. The court believes the investigator's role could have been minimized if he had been informed that Bentley had spoken with the Mobile County Sheriff's Office about the repossession and had been told by the Sheriff's Office who repossessed the vehicle. However, the bill is not so inappropriate as to require partial disallowance.

As for the attorneys' fees Bentley is entitled to under §362(h), no evidence was presented as to the amount of work performed, the hourly rate or the total amount of fees sought by either Kadel, Bentley's bankruptcy attorney, nor Anderson, Bentley's special counsel. The court will require counsel to submit fee applications within 20 days of this order and will rule after a hearing on the fees.

Bentley also seeks actual damages for emotional distress. "Actual damages" include damages for emotional distress. *Bishop v. U.S. Bank/Firstar Bank, N.A. (In re Bishop)*, 296 B.R.

-18-

890, 895 (Bankr. S.D. Ga. 2003); *e.g., Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir. 1999). For a debtor to be awarded actual damages for emotional distress resulting from the willful violation of the automatic stay, the "debtor's emotional distress must be more than fleeting, inconsequential, and medically insignificant." *Han*, 333 B.R. at 888 (citing *Aiello v. Providian Fin. Corp.*, 257 B.R. 245, 250 (N.D. Ill. 2000), *aff'd* 239 F.3d 876 (7th Cir. 2001)). In the absence of conduct of such an egregious or extreme nature that emotional distress would be expected to occur, a debtor must present some medical or other corroborating evidence showing that he suffered more than fleeting and inconsequential distress. *In re Hedetneimi*, 297 B.R. 837, 842 (Bankr. M.D. Fla. 2003).

"The potential for abuse if damages for a purely emotional injury can be awarded in suits to redress violations of the stay is considerable." *Aiello*, 239 F.3d at 881. Bentley has provided no evidence of emotional damages other than his testimony. Bentley testified at trial that he saw a doctor eight or nine months ago and was prescribed an antidepression medication, which he took for a period of time, but no longer takes. This testimony was different than his previous deposition testimony where he testified that he had not seen any doctors or taken any medication. Bentley also testified that he felt scared, embarrassed, and disappointed by the police report of drugs in his vehicle and the possibility that he could be arrested because of it. Additionally, Bentley argued that Nissan's repeated refusal to disclose the location of the police report caused him additional and continued emotional distress.

Despite the lack of direct evidence, the court believes Bentley is entitled to some additional award for having been put through the wrongful repossession attempt on October 21, 2004, and the wrongful repossession of October 24, 2004. Bentley should not have had to go

through these events. According to testimony, the Tarpon Lounge incident lasted one to two hours with lots of bickering and arguing. Several of Bentley's friends witnessed the incident, which no doubt caused Bentley substantial embarrassment and uneasiness. Likewise, Bentley should not have had to go through the wrongful repossession at his house, which included the initial fear that his truck had been stolen. In addition had the wrongful repossession not have taken place, the police report, whether legitimate or not, would not have been filed. One would expect emotional distress to occur as a result of the police report. Accordingly, the court finds Nissan's independent contractors' actions were egregious and caused Bentley emotional suffering. *See Bishop,* 296 B.R. at 895-98 (Bankr. S.D. Ga. 2003). Therefore, the court is awarding Bentley $1,000.00 for the emotional distress caused by the wrongful repossession.

However, the court does not find that Nissan caused any additional damages, emotional or otherwise, with regard to either the filing of the police report or the lapse in time before Bentley's attorneys got a copy of the report. Although Bentley's counsel repeatedly accused the repossession agents of "planting" the drugs in Bentley's vehicle, no evidence was ever shown to support this speculation. Even if Bentley had provided evidence that the drugs were planted by the repossession agents, Nissan would not have been liable because there was no evidence that Nissan directed, authorized, or ratified the alleged planting.

Bentley argued that Nissan could not escape liability for the repossession agents' actions because the duty of care owed during a repossession is nondelegable. Bentley is correct that Nissan had a nondelegable duty. Nissan could not delegate to the repossession agents the duty to avoid a breach of the peace. *See Thrash v. Credit Acceptance Corp.*, 821 So.2d 968, 972 (Ala. 2001); Ala Code § 7-9A-609 (2001). Therefore, while Nissan could and did delegate the

physical recovery of Bentley's truck, it remained liable for any injury or breach of the peace committed by its independent contractors while accomplishing the repossession. *Id.*

"Breach of peace" is not defined by the Alabama Code, but is left for the courts to interpret. The Alabama Supreme Court has found that a repossession is done peacefully (i.e., without breach of peace) if the repossession is performed "without risk of injury to the secured party, the debtor, or any innocent bystanders." *General Finance Corp. v. Smith*, 505 So.2d 1045, 1048 (Ala. 1987); *Callaway v. Whittenton*, 892 So.2d 852, 855-56 (Ala. 2003). In this case, the repossession of Bentley's truck occurred without a breach of peace.[9] The truck was repossessed without incident in the early morning hours of October 24, 2001. Nissan's independent contractors, the repossession agents, did not use threats or fraud to remove the truck. No one was in danger of being injured and no confrontations ensued. No one objected to the removal of the truck and no actual force was used other than that applied to the truck. Neither Bentley, nor anyone else at his residence, knew the vehicle was even gone until after the fact.

The allegations by Bentley that Nissan's independent contractors planted drugs in the truck were not proven. The Sheriff's Department destroyed the drugs with no criminal charges levied against any party due to proof problems. After hearing the testimony, this court cannot find by a preponderance of the evidence that a repossession agent put the drugs in the vehicle any more than the court can find that Bentley or any previous occupant of the vehicle put the drugs in the truck. The court believes Bentley's testimony that he did not do it, but that leaves numerous other possibilities. Even if the contractors did plant the drugs, there was no evidence when or

---

[9] There was evidence that supported a possible breach of peace by the repossession agents on October 21, 2004 at the Tarpon Lounge, but the damages for that incident have already been addressed.

where the planting took place. "Once a repossession agent has gained sufficient dominion over collateral to control it, the repossession has been completed." *Callaway*, 892 So.2d at 856-57 (citing *Clark v. Auto Recovery Bureau Conn., Inc.*, 889 F.Supp. 543, 547 (D. Conn. 1994) (quoting *James v. Ford Motor Credit Co.*, 842 F.Supp. 1202, 1209 (D. Minn. 1994))). If the drugs were planted, it is more likely that the planting took place after the truck was safely under the repossession agent's control and the repossession was complete, than during the repossession process, when there was a need for speed and stealth. Therefore, the court finds that the preponderance of the evidence shows that Nissan's nondelegable duty to not breach the peace was completed before its independent contractor contacted the police over the allegedly planted drugs. Thus, if the drugs were planted (and the court does not find that they were) Nissan is not liable for that action or any repercussions from it.

Additionally, Nissan is not liable to Bentley for Bentley's delay in obtaining a copy of the police report. The evidence reflects that when Kadel requested information about the police report from Nissan's employee Lampkin, she referred him to Nissan's attorney, Breithaupt. Breithaupt testified that he had never been asked, by Kadel or anyone else, to provide a copy of the police report or its location. Kadel's notes only reflect that he asked Hightower on October 26, 2004, if he knew where the police report was made and Hightower answered that he did not know. There was no showing that this was an untruthful answer. Without more, the court cannot hold Nissan liable for the delay in Bentley's attorneys obtaining a copy of the police report.

Additionally, the court finds that among Bentley, his attorneys and the private investigator, they could have located the police report with the information they already had. Bentley testified that he knew from the morning the truck was repossessed that the Mobile

County Sheriff's Office was involved and that the truck was repossessed by Ball at Gulf Coast Recovery. The Mobile County Sheriff's Office even gave Bentley a phone number for Ball. St. John, the private investigator hired to locate the police report testified that to find the report he needed the date the report was filed, the name of the person who filed it and the police jurisdiction it was filed in. Bentley had all this information. However, according to Bentley's testimony, St. John and Bentley never spoke to one another, much less exchanged information regarding the repossession. Furthermore, Deputy Bolton testified that he believed that police incident reports were public records. The court is not finding that Bentley, his attorneys, and St. John did not attempt to locate the police report, but it appears that if they would have communicated with each other better, they could have obtained the report on their own.

Finally, Bentley has alleged that Nissan's willful violation of the stay in this case warrants punitive damages. Section 362(h) allows for punitive damages "in appropriate cases." 11 U.S.C. § 362(h). Many courts have adopted the standard set forth in *Wagner v. Ivory (In re Wagner)*, 74 B.R. 898 (Bankr. E.D. Pa. 1987) to determine when appropriate circumstances exist for punitive damages.

> Punitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes. Such awards are reserved for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief. To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so.

*Wagner*, 74 B.R. at 903-04 (quoting in part *Cochetti v. Desmond*, 572 F.2d 102, 106 (3rd Cir. 1987)).

According to the Second Circuit Court of Appeals, a punitive damage award requires an

-23-

"additional finding of maliciousness or bad faith on the part of the offending creditor." *Maritime Asbestosis Legal Clinic v. LTV Steel Company, Inc. (In re Chateaugay Corp.)*, 920 F.2d 183, 186, n. 1 (2nd Cir. 1990). Other cases have required the creditor to demonstrate "an arrogant defiance of the federal law." *Matter of Mullarkey*, 81 B.R. 280, 284 (Bankr. D. N.J. 1987). Bankruptcy cases in the Eleventh Circuit have followed these and other cases and have not awarded punitive damages without weighty circumstances. *See Han*, 333 B.R. at 889 (Bankr. N.D. Fla. 2005); *Bishop v. U.S. Bank/Firstar Bank, N.A. (In re Bishop)*, 296 B.R. 890 (Bankr. S.D. Ga. 2003); *Flynn v. Int. Rev. Service (In re Flynn)*, 169 B.R. 1007 (Bankr. S.D. Ga. 1994).

As stated above, while Nissan delegated the repossession of the truck to independent contractors, it remained liable for the actions committed by its independent contractors during the attempted repossession and the actual repossession. The conduct of those independent contractors was inappropriate and reckless. On the night of October 21, 2004, after Bentley showed them a copy of his bankruptcy papers, the repossession agents stopped their repossession effort that night, only to blatantly disregard the automatic stay and repossess the vehicle just a few days later. This conduct demonstrated an arrogant defiance of the automatic stay and the Bankruptcy Code. As the repossession agents were acting on behalf of Nissan and with Nissan's authorization, Nissan is liable for the arrogant defiance of the automatic stay.

To Nissan's credit, when it learned that the repossession violated the automatic stay, it worked quickly to return the vehicle to Bentley. In fact, the evidence shows that Nissan was ready to return the vehicle even sooner, but Bentley's attorney would not immediately provide it with a delivery address. Nevertheless, the arrogant defiance demonstrated by the independent contractors after actual notice of Bentley's bankruptcy justifies an award of punitive damages.

*See Bishop*, 296 B.R. at 898-99. Nissan must understand it is liable for its independent contractors actions during a repossession and that flagrant disregard of the automatic stay will not be tolerated. The court concludes that a $5,000.00 punitive damages award is appropriate to deter any future similar actions by Nissan and its independent contractors. This amount is appropriate based upon similar fact patterns in which punitive damages were awarded in other cases. *E.g. Bishop, supra* (awarding $50,000 where repossession agent's "continued harassment of debtor in the face of actual knowledge of debtor's bankruptcy); *Bolen v. Mercedes Benz, Inc. (In re Bolen)*, 295 B.R. 803 (Bankr. D. S.C. 2002) (awarding $12,500 where repossession agents held the debtor's vehicle for ten weeks) (contains a listing of further cases awarding punitive damages); *Davis v. Gatorwheel, Inc. (In re Davis)*, 265 B.R. 453 (Bankr. N.D. Fla. 2001) (awarding $4,500 in case in which creditor held vehicle for one month). The *Bishop* case is similar to this case, except that the repossession agents involved the Sheriff's Office in their repossession efforts. This court concludes a $50,000 sanction is too much for the activities of Nissan and its independent contractors in this case. This case is less severe in terms of length of time the vehicle was held than *Bolen* and *Davis* in which the vehicle was held for a substantial period. However, this court believes the prior attempted repossession makes damages of more than the $4,500.00 awarded in *Davis* appropriate. The court will not award any additional punitive damages for the alleged criminal conduct asserted by Bentley, as these allegations were unproven. Likewise, no punitive damages will be awarded for Nissan's alleged misconduct in not providing a copy of the police report as this assertion was also unproven.

-25-

As stated above, Bentley had previously filed a bankruptcy case on November 4, 2003. In his bankruptcy schedules for that case, Bentley listed Nissan's total claim as $16,725.67, with $8,162.67 of that amount being unsecured, as Bentley valued his truck at $8,563.00. Bentley's schedules also stated that the truck had 106,000 miles on it at that time. The Chapter 13 plan filed by Bentley in the 2003 case, and subsequently confirmed by the court, provided that Nissan had a total secured claim of $11,429.00 ($8,563 collateral value at 12% interest). However, Bentley's 2003 case was dismissed for lack of payment on May 13, 2004. Nissan never received any payment from the 2003 case.

On October 6, 2004, Bentley filed his present bankruptcy. In his Schedule B, Bentley again listed the truck's value at $8,563.00, with the truck's mileage listed at 115,000 miles. The original proposed plan filed in the 2004 case again provided that Nissan had a total secured claim of $11,429.00 ($8,563.00 collateral value at 12% interest). However, on November 2, 2004, Bentley amended his plan to reduce the value of the truck to $5,300.00 at 12% interest. This amended plan expressly reserved all of Bentley's claims for willful and malicious postpetition repossession against Nissan. The amended plan was subsequently confirmed by the court on February 23, 2005, without objection from Nissan.

As for the claims filed by Nissan, the first claim was filed as a $17,723.48 secured claim. Bentley objected to this claim because the claim did not provide adequate documentation and overvalued Nissan's collateral. That objection was sustained and Nissan's first filed claim was disallowed.

-26-

After Bentley amended his plan to reduce the value of Nissan's collateral to $5,300.00, Nissan filed its second claim in the amount of $5,936.00. Bentley again objected to Nissan's claim on lack of documentation issues. The court has not yet ruled on the objection to Nissan's second filed claim.

After Bentley filed this adversary case, Nissan filed its third claim on January 10, 2006. The third claim was clearly marked that it was a replacement claim, which means it was intended to replace Nissan's second filed claim. The third claim listed Nissan as having a $6,423.48 secured claim with an $11,300.00 unsecured claim for a total claim of $17,723.48. This claim was signed by Brad Hightower, one of Nissan's attorneys. On January 31, 2006, Bentley filed an objection to this claim as well, based on the same grounds as before, but Bentley also took issue with Hightower's signing of the claim instead of a Nissan representative. The court has yet to rule on this objection.

On January 31, 2006, the same day Bentley objected to Nissan's third claim, Nissan filed its fourth claim, which was clearly marked as an amended claim, meaning that it amended the previously filed third claim. This claim was identical to the third claim, except that it included an attachment of an NADA vehicle valuation guide, which provided an estimated value for Bentley's vehicle based on the vehicle identification number of Bentley's vehicle, and an attachment of a complete payment history of Bentley's account with Nissan. Hightower also signed this claim. Bentley again objected on grounds that the payment history was not understandable, that the collateral was overvalued, that Hightower had signed the claim, and that the claim had been filed in violation of Bankruptcy Rule 9011 because it was filed while the second claim was still under litigation. The court has not yet ruled on this claim.

Eric Breithaupt, Nissan's attorney, testified at trial that the third and fourth claims filed by Nissan were not new claims as characterized by Bentley's counsel, but instead the third claim replaced the second and the fourth amended the third. Breithaupt stated that the fourth claim was only filed to include the attachments that were accidentally left off the third claim. Breithaupt testified that when Bentley objected to Nissan's second claim, which made litigation pending, Nissan wanted to make sure it fully set out Bentley's indebtedness, so the third claim, which replaced the second claim, was filed. As for Hightower's signing of the third and fourth filed claims, Nissan's corporate representative, Carolyn Brown, testified that Hightower, as local counsel for Nissan, was authorized to file the claim on Nissan's behalf. Bentley also argued that Nissan did not provide any independent evidence to support its valuation of the collateral since it had not inspected the truck. However, Nissan did provide the NADA valuation based on the truck's vehicle identification number to support its valuation.

As Nissan replaced its second claim, Bentley's objection to that claim can be sustained and that claim will be disallowed. Likewise, Bentley's objection to Nissan's third filed claim can be sustained and that claim disallowed, because the third claim was amended by the fourth claim. That leaves only Nissan's fourth filed claim and the objection thereto. The court will overrule the objection to Nissan's fourth filed claim and allow the claim as filed for the following reasons. First, documentation in support of Nissan's value and a complete payment history of the debtor's account were attached to the claim, as well as a copy of the purchase contract and the certificate of title. Second, Hightower was authorized to sign the proof of claim. Third, the claim did not violate Bankruptcy Rule 9011 because the previously filed claims that were being litigated were replaced or amended. Nissan was not asserting that it had several different claims on the same

-28-

collateral. To the contrary, each claim Nissan filed replaced or amended the previous claim, so that only one claim was validly outstanding at any one time. And lastly, Bentley failed to show the final claim filed by Nissan violated Revised Local General Order No. 25.

## *NISSAN'S MOTION FOR RELIEF FROM STAY*

Nissan also filed a motion for relief from stay due to Nissan's lack of adequate protection and the depreciation of Bentley's truck. At trial Bentley was asked by his attorney whether he had decided whether he would like to keep the truck or return it to Nissan. Bentley answered that he would like to return the truck to Nissan. Based on this testimony from the debtor, Nissan's motion for relief from stay will be granted, as Bentley does not wish to retain the collateral.

## *MALICIOUS INTERFERENCE CLAIM UNDER 11 U.S.C. § 329*

The final issue remaining in this case is Bentley's malicious interference claim under § 329 of the Bankruptcy Code. As Bentley did not provide any evidence for this claim at trial and the Code section does not provide any remedy for such a claim, that claim by Bentley will be dismissed.

THEREFORE IT IS ORDERED:

1) Defendant, Nissan Motor Acceptance Corporation, willfully violated the automatic stay under 11 U.S.C. § 362(h);

2) Plaintiff, Terry Lee Bentley is awarded actual damages in the total amount of $6,197.20. The award includes:
    a) $450.00 for missing or lost items;
    b) $3,263.00 for damage to vehicle;
    c) $1,484.20 for private investigator fees; and
    d) $1,000.00 for emotional distress.

-29-

3) Plaintiff will be awarded attorneys' fees in an amount to be determined at a later date. Attorneys Anderson and Kadel are ordered to submit fee applications to this court within 20 days from the date of this order. At a later date, the court will conduct a hearing on the fees and will determine the appropriate attorneys' fee award to Plaintiff.

4) Plaintiff is awarded $5,000.00 in punitive damages;

5) Plaintiff's § 329 claim is dismissed with prejudice;

6) The objections to Nissan's second and third filed claims are SUSTAINED and those claims are DISALLOWED;

7) The objection to Nissan's fourth filed claim is OVERRULED and that claim is ALLOWED AS FILED; and

8) Nissan's motion for relief from stay is GRANTED.

Dated:   August 10, 2006

MARGARET A. MAHONEY
U.S.  BANKRUPTCY JUDGE